Your Honor, we are here. Mr. Polnett is appealing his conviction of two counts of possession of illegal drugs and one count of being a felon in possession of a firearm under the Armed Career Criminal Act. We raised four issues on appeal and my argument this morning is going to focus primarily on the issues pertaining to the District Court's denial of Mr. Polnett's motion to suppress the evidence. Let me ask you about that. Pardon me? Let me ask you about that. Yes, Your Honor. We have a case, I know, that says that if you catch a drug dealer dealing drugs somewhere else, you can figure he probably has some in his home. I can't remember the name of it at the moment. Yes, Your Honor, I'm familiar with that case. So the only question is, is it his apartment? And why isn't it enough that he parks in Space 3 and they see him coming and going? To start my answer to your question, Your Honor, I want to remind the Court that the Fourth Amendment prohibition against unreasonable searches is most strong in a person's residence. Sure. I understand the general principles. I just want to know why can't it be inferred that it's his apartment from seeing him coming and going to that building and seeing him parking repeatedly in Space 3? Well, as the Court recalls from the transcript, what actually the way it worked was it was a hallway that led into two apartments. And the officer that testified that was doing the surveillance, he never saw Mr. Polnett actually coming out of apartment number 3. It was apartment number 3 and apartment number 4. But he parks in Space 3. But, Your Honor, there can be a lot of explanations. He's parking in Space 4's apartment 4 space all the time. You'd think the tenant in apartment 4 would get really mad and get the landlord home away. Consider this scenario, Your Honor. Mr. Polnett actually lived in apartment number 4, but he knew that the resident of apartment number 3 did not have a car. And so he wanted to use that parking space, and he had permission to do that. So if I look at Chavez-Miranda and I read what Chavez-Miranda has, there the officer said they believed it was Dee's apartment, the defendant's apartment, because the defendant's use of a remote device to open the security gate. The defendant parked his car in the apartment's gated parking lot. The apartment's electric utility was subscribed under his name. And the defendant was traveling back and forth between apartments. Now, to me, Chavez-Miranda would lead me to believe the district court knew what they were doing. And, Your Honor, I respectfully disagree. Well, that's what I asked you for. How do I distinguish it? I think the primary distinction here is the fact that the defendant in that case had the security device to open up a secure garage. Here you don't have that. You have an open parking lot. In order to get that security device, we can assume that the defendant had a security device to open up this particular place. He'd opened up that same place, and you'd still make your argument there was three and four, and he could have gone to either one. So I don't understand why the security device makes any difference. I mean, I live in a gated place, and everybody has a security device to get in the gated place, and we all park where we do. So I don't think the security device makes a whale of beans of difference. Point taken, Your Honor. Then let me move to the next distinction of that case, and that is that the defendant was a subscriber on the utilities. You don't have that here. That is another link. The case law requires that when you're searching a residence, you have a link between some evidence that links the residence to the suspected illegal activity, and you don't have that here. In the other cases that you see on this issue, you've got, especially when you've got a confidential informant, the informant has generally been to the defendant's house, or a third party has been to the defendant's house. What is my standard of review, counsel, on this particular determination? It's a de novo review, Your Honor. Well, I understand that, but when I'm trying to do this de novo, what do I look at? Am I not looking at a fair probability? Isn't that what I'm really looking at? Yes, you are, Your Honor. And what about Hill? What about United States v. Hill? What, if you will, should I, what deference should I give to the magistrate? Well, the... I mean, didn't Hill say the issuance of a search warrant by a magistrate is reviewed for clear error, and the determination of probable cause by the magistrate is then accorded great deference? Yes, that's correct. Okay, so I'm looking at fair probability, and I'm looking at the evidence that you have now put forth to us, and I'm saying again, how do I suggest that this is an error on a motion to suppress? Because, Your Honor, there simply is insufficient evidence connecting the illegal activity to Mr. Paulnett's residence, and there's insufficient evidence to assure the magistrate, the issuing judge, that Mr. Paulnett actually lives at apartment number three. There simply isn't any. And when you look at the trial transcripts, you even have the officer saying it was a process of elimination. I don't think a process of elimination should be, is high enough. What should I do with Leon? Well, that's the next issue, is whether or not this search warrant is entitled to the good faith exception of Leon. Okay, we've got a magistrate. He's issued the warrant now, and I've asked you the questions that I can about what error I should really say probable cause. Now I'm going to move good faith. I'm having a tough time understanding that the officers in this particular situation could not rely on the warrant in good faith. And there's several reasons why a trained officer would not. The primary reason is that the search warrant, first of all, the search warrant, the affidavit is extremely short, much shorter than usual. We have a short search warrant. Officers are supposed to come to the conclusion immediately. That's a worry. We ought to have a long one? No, Your Honor. The reason why the problem with it. It seems to me we concentrate on the facts. Exactly, and that is the problem with this search warrant affidavit being so short, is that it is very scarce on facts. Let me ask you something about fair probability. Yes. I wonder, since all they need is a fair probability, whether they could have gotten a warrant to search both 3 and 4 by saying he parks in 3, he used to live in 4, he uses the entrance for apartments 3 and 4. Why couldn't they say, we don't know which it is, but there's a fair probability that it's one of the two and we'd like to search both? Why couldn't they do that? Well, Your Honor, if there's little evidence that Mr. Paulnett lives in apartment number 3, there's even less that he lives in apartment number 4. Oh, I thought you just told us that he lived in 4. I'm sorry. I believe he lived in number 3. Do I have that mixed up? I had said he parked in 4. I had said he parked in 3. He parked in the parking spot in 3. People get mad if you take their space, so I figured the fact that he parks in 3 and nobody does anything to him is pretty solid for 3. But then you had replied that he used to live in 4 and they're the same entrance and they'd only seen him coming and going in that entrance. No, Your Honor, I'm sorry. Maybe I misunderstood. I could have easily have confused you as well. No, my argument in that situation was this is a hallway, and as you go up to the hallway, you have your choice of going into apartment number 3 or apartment number 4. I understood that. And my argument was that the police officer who was doing the surveillance never really saw him going into either door. But there was the additional evidence of his car being parked in the stall for apartment number 3. Counsel, aren't you forgetting, though, that there was an extensive amount of additional information in terms of these other buys and the people that they dealt with, things that were observed? You know, a search warrant has to show probable cause. It's not a statement of perfection. And I guess the question that was asked by my colleague, I think, is really the appropriate one here. The officers have a search warrant that the magistrate has signed. The officers are not, sometimes, most of them are probably not lawyers. They're not trained in the law. They look at the magistrate's signature. It's good enough for the magistrate. It's good for them. Do you have any evidence that these officers did not act in good faith in processing this search warrant? Yes, Your Honor, and I think it comes from the trial testimony. And part of our contention here is that if the district court had allowed an evidentiary hearing  But you see it just in terms of Deputy Schaefer's attitude on his examination. In one part of the ---- That's why we have people who observe the demeanor of the witnesses, make determinations, don't we owe some deference in this case? Was it abuse of discretion as far as the observation of what people say? Or you're suggesting that we apply a de novo standard there? I am suggesting that there's a de novo standard to determine whether the district court erred in not allowing a Franks hearing. It's an abuse of discretion for not allowing an evidentiary hearing, and I would argue that ---- Don't you have a burden to show that a Franks hearing was required, which basically is a suggestion that there was so much left out in the affidavit that this was almost a conspiracy by the officers, that there was basically a fraud on the court is what you're saying. You need a Franks hearing to ferret that out. Your Honor, I think characterizing it as a conspiracy might be a bit much. I think what it is clear, especially as it developed at trial, was there was a lot of material omissions. But do you need ---- What's your best omission, if you will? What was missing that you think would have made a difference here? My best omission is the information regarding the confidential informant. I don't actually understand why you need a Franks hearing. Let's assume, as I think anyone who's been involved in criminal law as a judge or a lawyer would, that the confidential informant is a criminal, dishonest, and he's working off of beef. Let's just assume that. Okay. When I read the search warrant affidavit, it looks like everybody involved knows that, and they're not covering that up, and so they use him as a robot. They strip search him before he goes in. They strip search him when he goes out. And let's see if I recall correctly, I think he's wired for sound. You could send in a robot if Polknett would sell to robots, and it just doesn't matter that there's a whole lot of stuff showing that the confidential informant shouldn't be trusted because nothing relies on his word in this warrant affidavit. Your Honor, I don't think there's anything in the affidavit that indicates that he's working off of beef. Everyone would assume that, but I can't see. Even if you were dealing with naive people here who assumed that the informant was just a fine citizen and he actually wasn't, I still can't see where it matters because they use him like a robot. Well, even robots need to prove, before you put them into use, even a robot needs to prove that the robot is going to operate correctly. Well, no, he doesn't. If you have him under surveillance the whole time and you make sure the robot isn't carrying in any drugs and you make sure he does carry out drugs by taking off all his clothes, making sure that there are no drugs in his clothes and none hidden in any parts of his body, which is what they say they did in the warrant. I mean, I'm assuming that the confidential informant is a liar who can't be trusted even with regard to the recesses of his body. But we do have a problem, Your Honor, with the constant surveillance. He was not under constant surveillance when these buys were made. As the trial evidence showed, they met at the convenience store, they got in a car, and they drove away. They say we watched him in the affidavit. We watched him go into and out of the buy location and back to us. And they say that he was searched prior to the buys. And the only thing that could conceivably be a matter of trusting him is during his initial debriefing, the CI identified a male named Mike as the source of the OxyContin. But even if that's a lie, which I would assume no one would believe it unless there was strong corroborating evidence, it just doesn't seem to matter because of the searches in and out and the surveillance when he goes in and out. Your Honor, and I'm going to answer your comment quickly. The only thing I can think of is, assuming the guy is a total crook, that he actually bought the Oxy from somebody in Apartment 4 and just said it came from Apartment 3. But even if you assume that, it doesn't defeat fair probability. The CI was never at Mr. Paulnett's apartment. And the other problem with the CI is that the so-called reliability was used on Mr. Paulnett himself. There isn't any evidence that he had been tested independently before he was put into use to further the investigation of Mr. Paulnett. So your argument is you've got to test him and then search him and then put a wire on him and then watch him get in the car and the wire's on him. And as soon as he gets through the buy, which they hear all under the wire about the buy, and he comes back and they search him again. I mean, they did that twice. There was nothing in this particular situation where this kid, crook or not, could have done anything. And you're correct, of course, Your Honor, but my point is that there wasn't any other independent evidence that the CI was useful, could obey the rules before he worked on Mr. Paulnett's case. I guess I don't find the case that says there's got to be something independent before. I find the case that says one has to, if they're going to use these CIs, make sure that they, well, in fact, I can read the stuff. They have to corroborate stuff that this informant would suggest. They have to, just can't go on what he would decide. And not only did they not corroborate here, they did more. They said, we watched on two different occasions. On both occasions, constant surveillance until he gets in the car, then a wire. He can't do anything about the wire. He's searched before he gets there. The wire's on all the time he's there, and the wire, and he's searched after. They're taking a chance, Your Honor, that the CI is going to comply with all of those requirements. What do you mean, taking a chance? There's nothing he can do. Because he had never done this before. This was his first time in operating as a CI. Let me ask you another question. Your framing of the facts is somewhat surprising to me. As I understood what the officers said, the officers did not say that they went down a long hall, or a long hall, and the officers could not really say whether it was one apartment or another. As I understood the testimony, the officers said he left the area where the apartment was. They couldn't see the door, but from their viewing point, he couldn't have come from any other apartment. That was the testimony. It isn't that, well, he went down a hall, and there was two apartments down there, and he could have gone in either one. The testimony was they couldn't see the door to that apartment. From their viewing point, however, he couldn't have come from any other apartment. And that simply, Your Honor, is the conclusion that Mr. Paulnett disputes. Again, we're at the district court. They're making the facts, and I appreciate we're on a motion to suppress here, but I don't buy this idea. A motion to suppress is de novo. I agree that a motion to suppress is a de novo. Did he apply the right law, and is the law applied right? But I'm not the one that makes the facts. I look at what the district court gives me for facts. As to clear error, he's got to, as my good colleague, the good presiding judge has suggested to you, we've got to have somebody reviewing those who come and testify, make their determination, and set the facts for us, and then see if they applied the law right. These are the facts the district court found. You can dispute those, but that's got to be clear error. I don't see anything in the record to say that's clear error. I think that the clear part of the problem for the district court, which becomes this court's problem as well, is that the facts were not fully fleshed out in an evidentiary hearing on the motion to suppress. The facts were fleshed out in trial, which is an entirely different situation. I think we have your argument. I see there are my colleagues who have additional questions right now. You've used your time, so we thank you, Ms. Olson, very much. Let's hear from the government. Good morning, Your Honors. Good morning. Helen Bruner on behalf of the United States. Let me start by talking a little bit about the facts because I think that needs a little bit of clarification, and I apologize because I probably should have put one photograph into the excerpts of record or something. If it's not in the record, no point telling us about it. I simply say this only because of the record. Is it in the record, this photograph you want to talk about? It is in the record. It was 14A as an exhibit at trial. We don't have exhibits unless they're put in the record on appeal. Yes, I know that, Your Honor, and I apologize for that. So it's not there? It's not there. Don't talk about it then. It would just be improper. Thank you, Your Honor. With respect to the agent's testimony at trial, I think that you can very clearly see what the officer talked about was a doorway or an entryway where there's two doors, and he can see one of the two doors and a staircase going up. And what he testifies to is he sees no one coming out of Door 4 and no one coming down the staircase. And with respect to the return of the Mr. Polnett to the apartment, he says the same thing. He sees him not going into it, doesn't see anyone going into 4. He sees no one going up the stairs. He couldn't see 3? He couldn't see 3. For purposes of this case, isn't Judge Kleinfeld correct that an officer executing this warrant would be able to rely on Leon? There's good faith here. There's nothing on the face of the affidavit or the warrant that would give the slightest concern. Is there about whether there was probable cause in the opinion of the magistrate judge? That is correct, Your Honor. That would certainly be the government's position. We think that even though it's perhaps not the longest warrant in the world, that it sets forth probable cause. And even if it does not, it's certainly Leon who saved it. I just do not understand why you have been apologizing for the affidavit being short. We just had another case where somebody had a 49-page affidavit, and it was mostly boilerplate, all 49-page single space. It's a means of deterring judges from reading it, I suppose. If you've got your probable cause in basically a page, page and a half, why are you apologizing? Is something missing here that you think you need? No, Your Honor. I don't think we need anything further. I think, you know, as with anything, you can write it briefly or you can write it. Now, it was Judge Smith who mentioned Leon. Is it your contention that we need Leon? No, Your Honor. Let me ask you about something else then. I got my no. Let me ask you about something else. It wasn't objected to, so it could only be a reason for appeal if there's plain error. And I'm not getting to the, what is it, O something case that gives us our plain error criteria at this point. Olano. Olano. Right. I am, I have frankly never seen a case where during voir dire jurors were asked what verdicts they reached in other cases. I've seen a lot of voir dires as a lawyer and as a judge where they were asked whether they'd sat on other cases. Is that error and how did that come about and why were they asked what verdicts they had reached? Your Honor, the judge asked only one of the, I believe, six jurors who responded that they had had prior jury service. I think, I don't know why the question was asked of that one juror. I do know that from reading the record, it is very clear that the jurors themselves when they were asked about their jury service, had they had prior jury service, were they able to reach a verdict? Some of them volunteered on their own what those verdicts were. And then when it came to, I believe, the second to the last juror that was asked questions, the judge asked about the verdict. So it's more a matter of symmetry than bringing out anything? I believe that would be accurate. And in any event, we had jurors who were on a hung jury, jurors who convicted and jurors who convicted of lesser included. There was a variety of different things. If I were the defense, I'd want a bunch of those hung jury jurors. Exactly. Maybe a couple of acquittals. Exactly. If I were the prosecutor, I'd want a whole bunch of five-minute convictions. There's also a discussion, for example, of one of the jurors who convicted in the prior trial, talking about how difficult that experience was. So I think if you look at all of the whole voir dire, there is really nothing that would absolutely show any form of bias. So certainly we're not going to get to plain error. On this ineffective assistance, is there any reason not to leave it for habeas? I don't believe there is any reason. Our usual practice is to leave it for habeas, but sometimes we resolve it on the appeal in chief. I don't believe that there is. The record certainly, in this case, shows that the exhibit list had the items in it. Why he was surprised, I don't know, because his brother testified at trial that he acknowledged at trial that they had played the tape for him during a pretrial interview. But beyond that, I think that the record could be more fully developed. I think the whole thing would turn on whether the lawyer gave his client the tapes or texts or told his client what was in them. And for that, it looked to me like we would need a separate habeas proceeding without an attorney-client privilege to find out. But I was wondering if I was missing something. I don't think you are, Your Honor. I think the government's argument, first argument, was that it should be a habeas. But in any event, I don't think that, given the overwhelming evidence in this case, that there's any prejudice. Thanks. If the Court has no further questions, I will ask the Court to affirm. Thank you. Thank you very much. We appreciate argument in the case. I don't think you have any time left, and I think we have your argument, Counsel. So we thank you both for your argument, and the case just argued is submitted.
judges: Kleinfeld, Smith, Smith